**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CANATXX GAS STORAGE LIMITED and CANATXX LNG LIMITED, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-06-1330 |
| SILVERHAWK CAPITAL PARTNERS, LLC, | § § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

This dispute involves an "Opportunity Cost Fee" allegedly due after a prospective deal between the parties was not completed. The parties are Canatxx Gas Storage Limited and Canatxx LNG Limited (collectively, "Canatxx"), natural gas firms based in the United Kingdom, and the defendant and counterclaim plaintiff, Silverhawk Capital Partners, LLC, an investment firm. Canatxx and Silverhawk signed an Indicative Term Sheet under which they worked toward Silverhawk investing in Canatxx. Silverhawk contends that after the proposed investment did not occur, Canatxx breached its obligation under that Indicative Term Sheet to pay Silverhawk a £3 million "Opportunity Cost Fee." Canatxx filed this suit seeking a declaratory judgment that it is not liable for the fee. Silverhawk counterclaimed to recover the fee.

The following motions are pending:

- Silverhawk has moved for summary judgment on its breach of contract counterclaim. (Docket Entry No. 41).  Canatxx responded, (Docket Entry No. 52), Silverhawk replied, (Docket Entry No. 58), and Canatxx surreplied, (Docket Entry No. 60).

- Canatxx has moved to strike exhibits attached to Silverhawk's summary judgment motion.  (Docket Entry No. 53).  Silverhawk responded to the motion to strike, (Docket Entry No. 56), and Canatxx replied, (Docket Entry No. 61).

- Silverhawk has moved to strike an expert declaration attached to and referenced in Canatxx's response to Silverhawk's summary judgment motion.  (Docket Entry No. 57).  Canatxx responded to the motion to strike.  (Docket Entry No. 62).

This court held oral argument on the parties' motions.  Based on the pleadings; the motions, responses and replies; the parties' submissions; counsels' arguments; and the applicable law, Silverhawk's motion for summary judgment is granted, Canatxx's motion to strike is denied, and Silverhawk's motion to strike is granted.  The reasons for these rulings are set out in detail below.

## I.    Background

Canatxx is a privately held corporation based in the United Kingdom.  Canatxx is involved in permitting, designing, constructing, and developing international power-generation and natural-gas projects.  Silverhawk is incorporated in Delaware.  It invests in management buyouts and private equity transactions in energy, natural resources, and other business sectors.

2

In mid-2005, Canatxx retained investment broker Robert Blackmon of UVEST Financial Services in Jackson, Mississippi to act as a "sales representative" to help Canatxx raise money.  Canatxx was seeking funds to repay a £10 million note to an entity called E.ON UK PLC.  The note would be due on September 30, 2005.  Canatxx was also seeking to finance projected capital expenditures and operating losses.

On May 19, 2005, Blackmon contacted Ted Gardner, an investor based in Charlotte, North Carolina, about investing in Canatxx.  On May 25, 2005, Gardner and three other individuals – David Scanlan, Mark Demetree, and James Cook – incorporated Silverhawk in Delaware.  None of the Silverhawk principals is a citizen of Texas or of the United Kingdom.

Gardner received copies of Canatxx's offering memorandum and other information about investing in Canatxx.  On June 16, 2005, Gardner and Demetree of Silverhawk met with Blackmon and with a Canatxx director and shareholder, Paul Grimes, in Houston.  On June 28, 2005, Grimes, another Canatxx director, Ross K. Hill, and Silverhawk principals Gardner, Cook, and Scanlan met again in Houston.  After these meetings, the parties continued to discuss Silverhawk both investing in Canatxx and helping Canatxx raise capital from third parties.  These discussions occurred by telephone and email.  During this period, Canatxx was also seeking capital from other potential investors.  Blackmon continued to seek potential investors besides Silverhawk to meet Canatxx's capital needs.

During June and July 2005, Silverhawk conducted preliminary due diligence into Canatxx.  Silverhawk's work included visiting Canatxx's facilities in the UK, analyzing

3

financial models, and studying permitting processes for LNG and gas-storage facilities. Grimes and Hill negotiated with Silverhawk on Canatxx's behalf. The discussions included executing a term sheet to apply before a deal was reached.

Silverhawk submitted a proposed term sheet with an exclusivity provision. This provision would have required Canatxx to negotiate exclusively with Silverhawk for ninety days. Canatxx refused to agree to the exclusivity provision. The evidence, including the parties' email and telephone communications, shows that Silverhawk wanted protection against the risk that Canatxx would choose another investor after Silverhawk had spent time, resources, and effort, and after it had foregone other investment opportunities, to pursue the Canatxx investment. The evidence also shows that Canatxx wanted to continue negotiating with other potential investors as protection against the risk that the Silverhawk deal would not close. (Docket Entry No. 41, Ex. 62 at 2–3). Canatxx rejected the proposed exclusivity clause but agreed to include the Opportunity Cost Fee provision in the Indicative Term Sheet that the parties signed. (*Id.*, Ex. 62 at 3–4).

On August 5, 2005, Hill, on behalf of Canatxx, and Cook, on behalf of Silverhawk, signed the Indicative Term Sheet. The proposed deal involved Silverhawk purchasing £20,000,000 in senior notes and other unidentified investors contributing at least £15,000,000 of additional capital through equity investments or the purchase of additional senior notes. The senior notes could be converted into Canatxx common stock. The Indicative Term Sheet also provided that Canatxx would pay Silverhawk a transaction fee of 2.5% of the total capital invested and raised by Silverhawk. (Docket Entry No. 41, Ex. 1).

4

The Indicative Term Sheet was a "summary of indicative terms and conditions" relating to Silverhawk's proposed investment in Canatxx.  The Indicative Term Sheet stated that it "should not be construed as a commitment to purchase by [Silverhawk]."  (Docket Entry No. 41, Ex. 1).  The Indicative Term Sheet stated that it was "for discussion purposes only and may vary depending upon a number of factors" and that "[m]ore detailed terms and conditions" would be set forth in "any definitive documentation."  The Indicative Term Sheet was "a binding contractual agreement between the parties only with respect to the Opportunity Cost Fee section and the section, Reimbursement of Expenses."  (*Id.*).

The Opportunity Cost Fee section stated:

> If any transaction (other than the transactions contemplated by this Indicative Term Sheet including the raising of up to £20,000,000 of capital in addition to that being purchased by Silverhawk) involving (I) the issuance of debt of [Canatxx], (ii) the sale of any direct or indirect equity interest in [Canatxx], or (iii) any acquisition, divestiture, merger, share exchange, consolidation, business combination, recapitalization, redemption, financing, sale of a substantial amount of assets or similar transaction involving [Canatxx] is closed, in each case at any time during the period of 90 days from the date hereof, then an Opportunity Cost Fee of £3 million shall be paid to Silverhawk by [Canatxx] and [Canatxx] additionally will pay all costs, fees and expenses incurred by Silverhawk.

(*Id.*, Ex. 1 at 6).  The Reimbursement of Expenses section stated:

> [Canatxx] agrees to pay all reasonable fees and expenses incurred by Silverhawk and the other investors in connection with the Senior Notes when requested, whether or not the transaction closes.

(*Id.*).

5

The Indicative Term Sheet described the "Investor Commitments" as follows: "Silverhawk: £20,000,000"; "[a] minimum of £15,000,000 of additional capital will be raised on terms satisfactory to [Canatxx] and to Silverhawk.  Silverhawk will assist the Company in raising this capital."  (Docket Entry No. 41, Ex. 1 at 1).

The Indicative Term Sheet included the following "Covenants" provision:  "The Senior Notes Purchase Documents shall include the following covenants and such other covenants, which shall be subject to exceptions agreed to by Silverhawk and the Company, as Silverhawk deems appropriate for this Transaction: . . . Prohibitions on the incurrence of additional indebtedness other than (I) trade payables and accrued expenses incurred in the ordinary course of business and (ii) the Company may issue up to £10,000,000 of additional Senior Notes to Investors sourced by Silverhawk or, alternatively, can raise up to £20,000,000 of additional capital, of which up to £10,000,000 can be Senior Notes (from investors to be approved by Silverhawk), and the remainder shall be equity."  (Docket Entry No. 41, Ex. 1 at 4–5).  The Senior Notes Purchase Documents were defined as "all required documentation" to be negotiated, executed, and delivered for the "closing and funding of the Senior Notes."  (*Id.*, Ex. 1 at 3).

The Conditions to Closing section of the Indicative Term Sheet stated that closing was subject to Silverhawk's completion "in form and scope satisfactory to Silverhawk in its sole discretion its due diligence review of the Company and its respective subsidiaries . . . and the results of such review shall be satisfactory to Silverhawk in its sole discretion."  (Docket Entry No. 41, Ex. 1 at 3).

After the parties executed the Indicative Term Sheet, Silverhawk conducted extensive due diligence.  The work included engaging third parties to appraise Canatxx's assets and to examine the permitting process for the Canatxx gas storage project in which Silverhawk proposed to invest.  The appraisal resulted in questions about the value of the Canatxx assets that were to serve as collateral for the £20,000,000 in Senior Notes that Silverhawk proposed to purchase.  Silverhawk also asked Canatxx questions about payments that Canatxx had made to its Texas affiliate, Canatxx Energy Ventures Limited.

On September 9, 2005, Silverhawk sent Canatxx a proposed revised term sheet.  The revised sheet reflected the concerns Silverhawk had expressed about Canatxx's financial condition, specifically  unexplained large cash payments to Canatxx's Texas-based affiliate and the value of the assets that were to serve as collateral for the Senior Notes.  (Docket Entry No. 41 at 10–11; Docket Entry No. 52, Ex. 3).  The proposed revised term sheet called for Canatxx to raise additional equity capital, barred Canatxx from raising non-Silverhawk capital through the issuance of debt, gave Silverhawk the right to select Canatxx's Chief Financial Officer, and prohibited transactions with Canatxx and its affiliates in excess of a predetermined monthly amount without Silverhawk's prior written consent.  (Docket Entry No. 52, Ex. 3).  In his affidavit, Gardner stated that Silverhawk was prepared to provide £20 to £30 million in senior convertible notes by September 30, 2005 if the parties reached a revised agreement addressing Silverhawk's concerns about the payments to the Texas affiliate and the collateral asset values, or if Canatxx satisfactorily answered the questions about the payments and the asset values.  (Docket Entry No. 41, Ex. 38 at 9–10).

7

Canatxx decided on receiving the proposed revised term sheet on September 9, 2005 that "we couldn't live with these new terms."  (Docket Entry No. 41, Ex. 37 at 610). Blackmon telephoned Gardner at Silverhawk on the same day that Silverhawk sent Canatxx the revised term sheet and stated that Canatxx declined to accept the proposed amended term sheet.  (Docket Entry No. 41 at 12; Docket Entry No. 52 at 5).  Silverhawk contends that through Blackmon, Canatxx stated that it no longer wanted to move forward on the deal and told Silverhawk to put its "pencils down."  Silverhawk asserts that after that point, Canatxx pursued funding from other sources.  (Docket Entry No. 41 at 11; *Id.*, Ex. 30).  Canatxx asserts that it was Silverhawk who caused the negotiations to stop by proposing unacceptable terms.  It is undisputed that other than discussions relating to reimbursing Silverhawk's expenses and paying the Opportunity Cost Fee, Canatxx did not contact Silverhawk about the proposed transaction after Blackmon's conversation with Gardner advising that Canatxx would not proceed on the amended term sheet.

On September 29, 2005, within the ninety-day period set in the Indicative Term Sheet, Canatxx closed a £10,000,000 convertible senior note agreement with Laminar Direct Capital L.P.  (Docket Entry No. 52 at 5; *Id.*, Ex. 4).  Canatxx also closed agreements with other parties within the ninety-day period.  These agreements provided £3,200,000 in equity. (Docket Entry No. 52 at 5–6; *Id.*, Ex. 16).

After September 9, 2005, Canatxx reimbursed Silverhawk for its expenses and for the fees it had paid third parties, such as accountants, for work on the proposed deal.  The reimbursements did not cover Silverhawk's own time and work. Canatxx refused to pay

8

Silverhawk the £3 million Opportunity Cost Fee.  (Docket Entry No. 41 at 13; Docket Entry No. 52 at 6).

This litigation followed.  Canatxx sued Silverhawk in Texas state court, seeking a declaratory judgment that it did not owe the Opportunity Cost Fee.  On February 23, 2006, Silverhawk sued Canatxx in the United States District Court for the District of Connecticut for the Opportunity Cost Fee, alleging breach of contract, breach of the duty of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act, based on the same underlying facts.  On April 17, 2006, Silverhawk removed the Texas state-court action to this court on the basis of diversity jurisdiction.  On July 14, 2006, this court denied Silverhawk's motion to dismiss, transfer, or stay this case in favor of the Connecticut suit.  (Docket Entry No. 15).  The Connecticut suit was transferred to this district on July 31, 2006 and the Connecticut and Texas suits were consolidated in this court on October 26, 2006.  (Docket Entry No. 25).

The parties dispute whether the transactions Canatxx closed between August 5, 2005 and November 3, 2005 are among those described by the parenthetical, "transactions contemplated by this Indicative Term Sheet including the raising of up to £20,000,000 of capital in addition to that being purchased by Silverhawk."  If Canatxx's transactions with Laminar and the other parties were "contemplated by this Indicative Term Sheet," Canatxx does not owe Silverhawk the £3 million Opportunity Cost Fee.  Canatxx also disputes whether the Opportunity Cost Fee is enforceable, raising arguments that it is a penalty or unconscionable.  Each of these issues is analyzed below.

9

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim. *Celotex*, 477 U.S. at 330. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary  judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B. Contract Interpretation

The parties agree that Texas law applies. Under Texas law, what a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). A court should construe an unambiguous contract according to the plain meaning of

11

its words.  *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985).  Unambiguous contracts

are enforced as written.  *Heritage*, 939 S.W.2d at 121.  In this case, the parties do not assert

that the relevant provisions of the Indicative Term Sheet were ambiguous.  (Docket Entry

No. 41 at 21; Docket Entry No. 52 at 1).

### III.    The Meaning and Application of the Opportunity Cost Fee Provision

#### A.    The Language of the Provision

The £3 million Opportunity Cost Fee is a type of break-up fee.  One court has

provided the following description of such a fee:

> A "break-up fee" is a fee paid to a potential acquiror of a
> business, or certain assets, by the seller, in the event that the
> transaction contemplated fails to be consummated and certain
> criteria in the purchase agreement are met.  The condition most
> commonly giving rise to the payment of a break-up fee is the
> seller's acceptance of a later bid.  Break-up fees may take the
> form of paying the out-of-pocket expenses incurred in arranging
> the deal, including due diligence expenses, or break-up fees may
> be wholly independent of the transaction costs.  For example, a
> break-up fee may include compensation for a bidder's lost
> opportunity costs.

*In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (citing *In re 995

Fifth Avenue Associates, L.P.*, 96 B.R. 24, 29, n. 6 (Bankr. S.D.N.Y. 1989)).

Break-up and similar fees are common in corporate transactions.  *See, e.g.*, *Cottle v.

Storer Commc'ns, Inc.*, 849 F.2d 570, 578–79 (11th Cir. 1988); *CRTF Corp. v. Federated

Dep't Stores*, 683 F. Supp. 422, 440-41 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington

Indus.*, 663 F. Supp. 614, 624 (S.D.N.Y.1987).  Courts recognize that a provision for an

opportunity cost fee or other type of break-up fee can serve several purposes.  Such a fee

12

provision can protect a prospective purchaser that makes an offer that is then "shopped around" to attract higher offers.  The prospective purchaser can use such a fee provision for protection if another buyer relies on its due diligence and other work to make a higher offer. Such a fee provision may also serve to discourage a bidding strategy designed to hold back competitive bids until late in the process; aid the seller in negotiating an initial bid that is the offeror's highest bid; establish a high floor early in the bidding process; and enhance the bidding process by creating momentum toward closing a sale. *See, e.g.*, *In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y 1998); *Integrated Res., Inc.*, 135 B.R. at 750.

The Opportunity Cost Fee in this case is not triggered if Silverhawk and Canatxx merely failed to close the transaction they were negotiating.  The fee is due only if Canatxx closed:

• a transaction within ninety days from the date of the Indicative Term Sheet;

• that transaction involved "(I) the issuance of debt of [Canatxx], (ii) the sale of any direct or indirect equity interest in [Canatxx], or (iii) any acquisition, divestiture, merger, share exchange, consolidation, business combination, recapitalization, redemption, financing, sale of a substantial amount of assets or similar transaction"; and

• that transaction was "other than the transactions contemplated by this Indicative Term Sheet including the raising of up to £20,000,000 of capital in addition to that being purchased by Silverhawk."

13

The record shows that transactions involving Canatxx closed within the ninety-day period, involving the issuance of debt or the sale of equity by Canatxx.  Canatxx closed a £10,000,000 convertible senior note agreement with Laminar on September 29, 2005. (Docket Entry No. 52 at 5; *Id.*, Ex. 4).  The agreements with other investors provided Canatxx with £3,200,000 in equity.  (Docket Entry No. 52 at 5–6; *Id.*, Ex. 16).  The critical issue is whether Canatxx's transactions with Laminar and with the other investors were "other than the transactions contemplated by this Indicative Term Sheet."

Although the Opportunity Cost Fee provision and the Reimbursement of Expenses provision are the only binding provisions of the Indicative Term Sheet, interpreting them requires examining other provisions to determine what transactions are "contemplated by" the Indicative Term Sheet.  A court must "construe the terms of the contract as a whole and consider all of its terms, not in isolation, but within the context of the contract."  *SMI Realty Mgmt Corp. v. Underwriters at Lloyd's, London*, 179 S.W.3d 619, 624 (Tex. App.–Houston [1st Dist.] 2005, pet. denied); *see also State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

### B.    "Transactions Contemplated by this Indicative Term Sheet"

#### 1.    *Transactions That Raise Capital "In Addition to that Being Purchased by Silverhawk"*

The Opportunity Cost Fee provision states that the transactions "contemplated by this Indicative Term Sheet includ[e] the raising of up to £20,000,000 of capital *in addition* to that being purchased by Silverhawk." (emphasis added).  The parties dispute whether Canatxx's

14

convertible senior note agreement with Laminar and the equity agreements with other investors were "in addition to" the proposed Silverhawk investment. (Docket Entry No. 41 at 21; Docket Entry No. 52 at 11).

The meaning of the words "in addition to" is "in addition to" the initial investment to be made by Silverhawk, the primary focus of the Indicative Term Sheet. The Opportunity Cost Fee provision language, "transactions contemplated by this Indicative Term Sheet," means transactions that raise money for Canatxx from investors besides Silverhawk, as a supplement to the money to be supplied by Silverhawk, not as a replacement for the money to be supplied by Silverhawk.

The Opportunity Cost Fee provision, the Investor Commitments provision, the Covenants provision and the Term provision all support this conclusion. The Investor Commitments section of the Indicative Term Sheet stated that Silverhawk and Canatxx would negotiate toward Silverhawk's purchase of £20,000,000 in Series A Convertible Senior Notes and that "[a] minimum of £15,000,000 of additional capital will be raised on terms satisfactory to [Canatxx] and to Silverhawk" from "other investors to be identified." (Docket Entry No. 41, Ex. 1 at 1). The Term provision stated that "[a]ll Senior Notes will mature on December 31, 2006 unless prior to that date, £20,000,000 of capital in addition to the Senior Notes acquired by Silverhawk shall have been raised, in which case the Senior Notes will mature on March 31, 2007." (*Id.*, Ex. 1 at 2). The Senior Notes Purchase Documents were to include a covenant prohibiting Canatxx from incurring additional indebtedness and an exception allowing Canatxx to "issue up to £10,000,000 of additional

15

Senior Notes to investors sourced by Silverhawk or, alternatively, [to] raise up to £20,000,000 of additional capital, of which up to £10,000,000 can be Senior Notes (from investors to be approved by Silverhawk), and the remainder shall be equity." (*Id.*, Ex. 1 at 5).

These provisions lead to the conclusion that the transactions contemplated in the Indicative Term Sheet, other than the £20,000,000 issuance of Senior Notes to Silverhawk, are transactions that: (1) raise "additional capital" to the Silverhawk notes;  (2) raise that capital "on terms satisfactory to [Canatxx] and to Silverhawk"; and (3) do not result in Canatxx incurring additional debt, with the exception that Canatxx may "issue up to £10,000,000 of additional Senior Notes to investors sourced by Silverhawk or, alternatively can raise up to £20,000,000 of additional capital, of which up to £10,000,000 can be Senior Notes (from investors to be approved by Silverhawk), and the remainder shall be equity." (Docket Entry No. 41, Ex. 1).  The transactions with Laminar and other investors were not "in addition to" the Silverhawk transaction, despite the fact that the amounts of the Laminar transaction and the other investor transactions are within the dollar amounts – up to £20,000,000 of additional capital, of which up to £10,000,000 can be Senior Notes – discussed in those provisions, because the evidence shows that the capital raised from Laminar and other parties was a replacement for the money that Silverhawk had proposed to invest.  (*Id.*).

The Investor Commitments provision of the Indicative Term Sheet refers to a £20,000,000 investment by Silverhawk and a "minimum of £15,000,000 of additional

capital." "Additional capital" plainly means "in addition to the £20,000,000 to be invested by Silverhawk." The Covenants provision described covenants to be included in the "Senior Notes Purchase Documents," which are defined in the Conditions to Closing provision as those documents necessary to the closing and funding of the Senior Notes to be issued to Silverhawk. The Covenants provision assumes that Silverhawk and Canatxx prepare and execute documents to effectuate a contract for Silverhawk's investment in Canatxx. The Covenants provision allows Canatxx to incur additional debt only on two conditions: first, the amount is up to £10,000,000 of additional Senior Notes and the investors are "sourced by Silverhawk"; second, the amount is up to £20,000,000 of additional capital of which up to £10,000,000 could be from Senior Notes issued to investors "approved by Silverhawk," with the remainder being equity investments. The word "additional" clearly means "in addition to" the Senior Notes to be purchased by Silverhawk, the investment that was the focus of the Indicative Term Sheet.

The Term provision states: "All Senior Notes will mature on December 31, 2006 unless prior to that date, £20,000,000 of capital in addition to the Senior Notes acquired by Silverhawk shall have been raised, in which case the Senior Notes will mature on March 31, 2007." (Docket Entry No. 41, Ex. 1 at 2). This provision, as Silverhawk points out, deals with the term of the Senior Notes to be issued to Silverhawk. And the plain language of the Term provision describes raising capital "in addition to the Senior Notes acquired by Silverhawk."

17

Canatxx argues that the Opportunity Cost Fee would only apply if Canatxx closed transactions before November 3 that raised more than £20,000,000 in capital or involved the issuance of more than £10,000,000 in Senior Notes.  (Docket Entry No. 52 at 15).  Canatxx states that under Silverhawk's approach, "the Opportunity Cost Fee may have been required – even if there had been a closing with Silverhawk – if Canatxx had also raised more than £20,000,000 of additional capital from third parties, or if Canatxx had closed a transaction with a third party that involved issuance of more than £10,000,000 in Senior Notes, during the 90 day period."  (*Id.*).  The Indicative Term Sheet language does not support this argument.  The issue under the Opportunity Cost Fee provision is not the amount of the Laminar and other third party investments, or whether they were made before a Silverhawk investment, but whether Canatxx raised the third-party capital in place of Silverhawk's capital and whether the third-party capital was raised on terms satisfactory to Silverhawk.  The record shows that Canatxx raised the third-party capital in place of Silverhawk's investment.

Silverhawk has submitted evidence that Canatxx refused to accept financing from Silverhawk after the proposed revised term sheet was sent on September 9, 2005, and that Canatxx entered into the Laminar and other transactions in place of the Silverhawk transaction.  (Docket Entry No. 41 at 11; *Id.*, Exs. 30, 38).  Canatxx responds that "the Laminar transaction did not 'negate' the need for Silverhawk's investment" and that Silverhawk, not Canatxx, declined to move forward with the proposed investment.  (Docket Entry No. 52 at 4, 11–12).

Silverhawk has submitted an email from Ted Gardner, one of Silverhawk's principals, sent on September 9, 2005 at 4:09 p.m. to other firm members, as evidence that it was Canatxx who declined to move forward with the deal and instead sought capital to replace Silverhawk's proposed investment. In that email, Gardner recounts a just-finished phone conversation with Robert Blackmon of UVEST Financial Services, who represented Canatxx with potential investors. The email stated:

> Guys-
>
> Rob Blackmon just called. Said [Canatxx] mgmt did not want to move forward with SCP [Silverhawk] on the deal, and that Rob was calling to deliver the news. Said mgmt intended to work full out on finding another way to get the money necessary to pay off Eon (even if it is 7 mm pounds of Tranche plus another 3 mm pounds). I asked who was more likely source of revised money, Centrica or Laminar, and Rob said 50/50. Clearly mgmt wants to abandon the SCP deal. Mgmt wants us to put pencils down.
>
> Rob wants to know what our estimated expenses. Asked us to specifically cut off work by Clifford Chance. Rob said all the right things about hoping to find a settlement on fees, and expenses and opportunity costs that would allow us all to be "friends." I told him we would get expense estimate to him, and asked him to make us a proposal on break-up fee.
>
> We are OFF for trips to London and Houston. Jim and I suggest we have a call on Sunday morning to get reactions. Obviously, call Jim or me if you want play-by-play. Ted.

(Docket Entry No. 41, Ex. 30). The parties dispute whether this email is admissible as summary judgment evidence.

19

Silverhawk submitted an affidavit signed by Gardner.  In the affidavit, Gardner stated that he had reviewed emails, including the email recounting the September 9, 2005 phone conversation with Rob Blackmon, as well as letters, reports, and other documents submitted by Silverhawk as exhibits.  Gardner stated that "each one is a true and correct copy of a record made and/or kept by Silverhawk Capital Partners in the course of our regularly conducted business activity.  It is Silverhawk's regular practice to make and/or keep these records.  Each of the documents is a report or record of events, acts, or opinions made at or near the time by a person with knowledge or from information transmitted by a person with knowledge."  (Docket Entry No. 41, Ex. 38 at 10–13).

Gardner's affidavit also provided additional detail about his telephone conversation with Blackmon:

> Blackmon was calling to tell me that Canatxx did not want to move forward on a deal with Silverhawk if that meant Canatxx had to provide information on the CEVL payments and the asset values, but would be working "full out" to find another way to get the funding to repay the E.ON loan.  Blackmon told me it was likely that either Laminar or Centrica would provide the funding.  He directed Silverhawk to stop all work on the transaction immediately.  He also asked for an estimate of Silverhawk's expenses and said he hoped Silverhawk and Canatxx could reach an amicable agreement on the opportunity cost fees.  He specifically told me that (1) Canatxx would not answer Silverhawk's questions relating to the CEVL payments; (2) Silverhawk should cancel the due diligence trips scheduled to London and Houston on September 12 and 13, 2005, respectively; (3) Canatxx would obtain financing from another entity; and (4) Silverhawk should submit its fees and expenses for reimbursement.  As soon as I finished my conversation with Blackmon, I sent an e-mail to Scanlon, Demetree, and Cook relating my conversation with Blackmon.

20

(*Id.*, Ex. 38 at 9).

Canatxx asserts that the affidavit is inadmissible because it is not based on personal knowledge and contains hearsay. Canatxx asserts that Gardner's email is also inadmissible hearsay. (Docket Entry No. 53 at 5–7). Canatxx argues that Gardner's affidavit is not sufficient to establish that his email falls under the business records exception to the hearsay rule because the certification statement does not demonstrate that it was the regular practice of Silverhawk to make such a record. (Docket Entry No. 61 at 2). Silverhawk responds that the email falls under both the business records and present-sense impression hearsay exceptions. (Docket Entry No. 56 at 3–5, 9–10).

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony." FED. R. EVID. 602. Gardner testified that he had personal knowledge of the contents of the phone conversation with Blackmon. Gardner's affidavit is not inadmissible for lack of personal knowledge.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is generally not admissible. FED. R. EVID. 801, 802. A statement is not hearsay if it is offered against a party and is "a statement by a person authorized by the party to make a statement concerning the subject" or it is a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the

relationship." FED. R. EVID. 801(d)(2). "Under the Federal Rules of Evidence, '[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.'" *Ramirez v. Gonzales*, 225 Fed. Appx. 203, 210 (5th Cir. 2007) (quoting FED. R. EVID. 805).

Blackmon was retained by Canatxx to serve as its agent in dealings with potential investors, including Silverhawk. (Docket Entry No. 41, Ex. 37 at 608–09). Canatxx contends that it did not authorize Blackmon to tell Silverhawk that Canatxx was unwilling to continue working toward the potential Silverhawk investment. (Docket Entry No. 52, Ex. B at 4). Under Rule 801(d)(2)(D) of the Federal Rules of Evidence, "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is considered an admission by a party-opponent and is not hearsay. "According to 801(d)(2)(D), an agent may make vicarious admissions for his principal whether or not he is specifically authorized to speak on that subject." *Glendale Federal Bank, FSB v. United States*, 39 Fed. Cl. 422, 424 (Fed. Cl. 1997). Blackmon's statement to Silverhawk that Canatxx was not willing to continue working toward the potential Silverhawk investment directly concerned the matter for which Blackmon had been retained by Canatxx, and the statement was clearly made within the scope of the agency relationship. *See Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 99 (Tex. 1994) ("In determining a principal's vicarious liability, the proper question is not whether the principal authorized the specific wrongful act; if that were the case, principals would seldom be liable for their agents' misconduct. Rather, the proper inquiry is whether the agent was

acting within the scope of the agency relationship at the time of committing the act."); *Grace Cmty. Church v. Gonzales*, 853 S.W.2d 678, 680 (Tex. App.–Houston [14th Dist.] 1993, no writ) ("An 'agent' is one who is authorized by another to transact business or manage some affair.").

Blackmon was hired specifically for the purpose of communicating with investors about potential investments in Canatxx.   Gardner's affidavit describing Blackmon's statements is admissible because Blackmon's statements are statements by a party opponent, regardless of whether Canatxx specifically authorized them.

Silverhawk contends that Gardner's email is admissible under Rule 803(6) as a record of regularly conducted activity.  "[T]he rationale underlying this exception to the rule against hearsay is that the inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'"  *United States v. Wells*, 262 F.3d 455, 462 (5th Cir. 2001) (*quoting* FED. R. EVID. 803(6) Committee Note).   "Whether evidence is admissible under Rule 803(6) is chiefly a matter of trustworthiness."  *Id.* at 459–60 (quotations omitted).

Neither a paper document, such as a letter or memo or note, nor an email, falls within the business-records exception of Rule 803(6) simply because it concerns a business matter. *See, e.g.*, *United States v. Robinson*, 700 F.2d 205, 209–10 (5th Cir. 1983).  Courts have held that conventional letters, memos, or notes are admissible under the business records exception if they are regularly made in furtherance of the employer's needs and not for the

23

personal purposes of the employee who made them. *See, e.g.*, *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) (finding that letters did not fall within the business records exception); *Robinson*, 700 F.2d at 209–10 ("We conclude that these notes may not be considered 'records of regularly conducted activity,' admissible under Rule 803(6), Federal Rules of Evidence, absent a showing that [an employee] regularly compiled them as part of his official duties.") (footnote omitted). Courts have applied a similar approach to emails.  A party seeking to introduce an email made by an employee about a business matter under the hearsay exception under Rule 803(6) must show that the employer imposed a business duty to make and maintain such a record.  Courts examine whether it was the business duty of an employee to make and maintain emails as part of his job duties and whether the employee routinely sent or received and maintained the emails.  *See DirecTV, Inc. v. Murray*, 307 F. Supp. 2d 764, 772–73 (D.S.C. 2004) (finding that sales records contained in emails were admissible under the business records hearsay exception when the sales orders were regularly received by email and the emails were retained as records of each order); *New York v. Microsoft*, No. CIV A. 98-1233(CKK), 2002 WL 649951, at *2 (D.D.C. Apr. 12, 2002) (declining to admit emails under the business records hearsay exception because there was a "complete lack of information regarding the practice of composition and maintenance of" the emails); *United States v. Ferber*, 966 F. Supp. 90, 98 (D. Mass. 1997) (holding that "in order for a document to be admitted as a business record, there must be some evidence of a business duty to make and regularly maintain records of this type," and finding that emails submitted by the government did not fall under the business records

exception because "while it may have been [an employee's] routine business practice to make such records, there was no sufficient evidence that [the employer] required such records to be maintained."); *but see Piere v. RBC Liberty Life Ins.*, Civil Action No. 05-1042-C, 2007 WL 2071829, at *2 (M.D. La. July 13, 2007) (finding that emails fell within Rule 803(6) because they were prepared by employees "during the ordinary course of business," but declining to note whether it was the business duty of the employees to make and maintain emails as part of their job duties ).

Silverhawk argues that the email from Gardner recounting his telephone conversation with Blackmon relaying Canatxx's decision not to proceed on a deal with Silverhawk and directing Silverhawk to stop work falls "squarely within the business records exception." (Docket Entry No. 56 at 3–5).  Canatxx argues that Gardner's affidavit providing the business records predicate is insufficient because it is a "blanket statement" that broadly applies to emails between Silverhawk partners, emails to Silverhawk partners from third parties, and other documents received by Silverhawk.  (Docket Entry No. 61 at 2).  Canatxx also points to a statement by Gardner in his deposition as evidence that neither he nor other Silverhawk personnel regularly kept records of meetings.  When asked, "[w]ith respect to either of the first two meetings or the July 11 trip to England, did either you or anyone else at Silverhawk generate reports about the substance of the meetings afterwards?" Gardner responded that "[w]e don't work on that basis, no."  (Docket Entry No. 52, Ex. 5 at 42).

Gardner stated in his affidavit that the email following his telephone conversation with Blackmon was "made and/or kept by Silverhawk Capital Partners in the course of our

regularly conducted business activity" and that "[i]t was Silverhawk's regular practice to make and/or keep these records."  He also provided an affidavit describing how, when, and why he sent the email.  Together, these statements satisfy Rule 803(6) by stating that the email was made and maintained in the normal course of Silverhawk's business by a person with personal knowledge right after the matters set forth in the email.  Gardner's affidavit states that he wrote the email in the routine course of his duties as a Silverhawk principal.  The record is sufficient to show that Silverhawk maintained the email as a regular part of its business activities.  The absence of more detailed information about how Silverhawk generally maintained its emails does not raise the reliability concerns present in cases involving email "chains" with multiple authors who forward communications among multiple employees.  *See, e.g.*, *Microsoft*, 2002 WL 649951, at *2.

Additionally, the email is admissible under the present-sense impression exception to the hearsay rule.  Federal Rule of Evidence 803(1) provides that a hearsay statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" is admissible regardless of the availability of the declarant.   "The justification for this hearsay exception relies on the contemporaneousness of the event under consideration and the statement describing that event.  Because the two occur almost simultaneously, there is almost no 'likelihood of [a] deliberate or conscious misrepresentation.'" *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991) (quoting FED. R. EVID. 803(1) Committee Note).  Precise contemporaneity is not required.  *See* FED. R. EVID. 803(1) Committee Note ("[I]n many, if not most, instances

precise contemporaneity is not possible and hence a slight lapse [of time] is allowable."); *Miller v. Crown Amusements, Inc.*, 821 F. Supp. 703, 706–07 (S.D. Ga. 1993) (statements made within ten minutes of event admissible under Rule 803(1)).

Gardner stated in his affidavit that the email was sent "[a]s soon as I finished my conversation with Blackmon." (Docket Entry No. 41, Ex. 38 at 9). The email itself states that Blackmon had "just called." (Docket Entry No. 41, Ex. 30). The email is admissible as a present-sense impression. *See Ferber*, 966 F. Supp. at 99 (finding that an email prepared shortly after a phone call that summarized the contents of the phone call qualified as a present sense impression). The email is competent summary judgment evidence.

Canatxx submitted an October 10, 2007 affidavit by one of its directors, Ross K. Hill, stating that "[b]etween August 5, 2005 and November 3, 2005, Canatxx did not advise Silverhawk that Canatxx was not willing to continue working toward the potential Silverhawk investment outlined in the August 5, 2005 Term Sheet, nor did Canatxx instruct or authorize any third party to so instruct or advise any representative of Silverhawk." (Docket Entry No. 52, Ex. B at 4). In his earlier deposition, taken on June 15, 2007, Hill testified that Canatxx decided on receiving the proposed revised term sheet on September 9, 2005 that "we couldn't live with these new terms." (Docket Entry No. 41, Ex. 37 at 610). Hill testified that Canatxx asked Blackmon "[t]o explain [to Silverhawk] that we couldn't live with the new terms but we – we can certainly live with the old terms but we can't live with the new terms . . . . We didn't say that there were others we couldn't live with but we said we could not live with the new terms." (*Id.*, Ex. 37 at 611). Hill testified that Canatxx

27

did not ask Blackmon to tell Silverhawk to stop work, that Canatxx did not want to go forward on a deal with Silverhawk, or that Canatxx intended to find funding somewhere else. Hill testified that Blackmon was not authorized to tell Silverhawk that Canatxx did not want to move forward with a deal. (*Id.*, Ex. 37 at 610, 613, 615). However, Hill conceded in his deposition that he did not remember the contents of his phone call with Blackmon on September 9, 2005. He acknowledged that his testimony about the contents of that phone call was "based on my recollection of what we felt when we – what we did when we saw the [proposed revised term sheet]" and what he believes he would have said in the conversation. (*Id.*, Ex. 37 at 617–18). He conceded that it might be true that he told Blackmon to convey to Silverhawk that Canatxx intended to find an alternate source of funding if Canatxx "couldn't get a deal to work with Silverhawk." (*Id.*, Ex. 37 at 614).

Hill has no personal knowledge of the telephone conversation between Gardner and Blackmon. Hill's statements about what he told Blackmon to convey to Silverhawk are based not on what he remembers saying but on what he thinks he would have said. Hill conceded that he might have told Blackmon that Canatxx intended to pursue an alternate source of funding if Canatxx could not do a deal with Silverhawk and conceded that he told Blackmon that Canatxx could not live with the amended terms Silverhawk proposed.[1]

---

[1] To the extent Hill's later affidavit contradicts the statements made in his deposition that he had no recollection of what he told Blackmon and that he had no personal knowledge of what Blackmon told Silverhawk, the affidavit raises additional concerns. "When an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism. *See Herrera v. CTS Corp.*, 183 F. Supp. 2d 921, 928 (S.D. Tex. 2002). Indeed, it is within the court's discretion to disregard the affidavit altogether should the court determine that it is dealing with a 'sham affidavit.' *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that the utility of summary

The record – including the email from Gardner describing his telephone call with Blackmon on September 9, 2005, Gardner's affidavit, and the deposition testimony from Hill describing his telephone conversation with Blackmon about Canatxx's unwillingness to go forward with any deal with Silverhawk on the basis of the revised term sheet – contains competent summary judgment evidence demonstrating that Canatxx's convertible senior note agreement with Laminar and the equity agreements with other investors did not raise capital "in addition" to that which would be contributed by Silverhawk.  The undisputed evidence shows that Canatxx's sales representative, Blackmon, told Silverhawk that Canatxx did not want to move forward on the deal with Silverhawk on the basis of the proposed amended term sheet and that Canatxx intended to find another source for the capital if it could not proceed on the Silverhawk deal.  (Docket Entry No. 41, Exs. 30, 38 at 9).  Hill's deposition and affidavit do not contradict the evidence that Canatxx's agent made these representations to Gardner.  Hill's deposition and affidavit do not raise a disputed fact issue material to determining whether the convertible senior note agreement with Laminar and the equity agreements with other investors were made in place of the Silverhawk transaction rather than "in addition" to it.

> 2.    *Transactions that Raise Capital "On Terms Satisfactory to . . . Silverhawk"*

---

judgment would be greatly diminished if courts were unable to screen out 'sham issues of fact')." *Texas Sales and Marketing, Inc. v. Distinctive Appliances, Inc.*, Civil Action No. H-05-3555, 2007 WL 399292, at *6 (S.D. Tex. January 31, 2007).

The transactions contemplated by the Indicative Term Sheet, other than the £20,000,000 issuance of Senior Notes to Silverhawk, are described in the Investor Commitments section as "[a] minimum of £15,000,000 of additional capital" to be "raised on terms satisfactory to [Canatxx] and to Silverhawk."  (Docket Entry No. 41, Ex. 1 at 1).  Similarly, the Covenants provision requires that transactions involving an "additional" £10,000,000 of senior notes may only involve investors "sourced by Silverhawk" and transactions raising up to £20,000,000 of additional capital can include up to £10,000,000 in Senior Notes "from investors to be approved by Silverhawk."  (*Id.*, Ex. 1 at 5).  Silverhawk has submitted competent summary judgment evidence that the convertible senior note agreement Canatxx entered into with Laminar and the equity agreements Canatxx reached with other investors did not raise capital "on terms satisfactory to [Canatxx] and to Silverhawk."  Canatxx did not inform Silverhawk of the terms of the Laminar agreement before it occurred.  Silverhawk did not learn of the potential Laminar transaction until September 15, 2005, and the source of information was a Laminar officer.  (Docket Entry No. 41, Ex. 38 at 10).  In his affidavit, Gardner stated that the Laminar transaction was "unquestionably not satisfactory to Silverhawk." (*Id.*).  Canatxx has not submitted controverting evidence that the terms of the Laminar deal were satisfactory to Silverhawk.

Canatxx argues that Silverhawk approved Laminar as an additional investor and that the Covenants provision did not require Silverhawk to approve equity investors.  (Docket Entry No. 60 at 5).  The Indicative Term Sheet required that the *terms* on which any additional capital was raised be satisfactory to Silverhawk, not just that the entity making the

investment be approved.  The evidence is undisputed that Silverhawk did not know the terms of Canatxx's Senior Note agreement with Laminar or equity agreements with other investors. Those transactions were not on terms satisfactory to Silverhawk.  The second criteria necessary for transactions to avoid triggering the Opportunity Cost Fee is not met.  The transactions are not "contemplated by this Indicative Term Sheet" and trigger the Opportunity Cost Fee.

### C.  Conclusion

The transactions with Laminar and the other investors were not contemplated by the Indicative Term Sheet because they did not raise capital "in addition to" Silverhawk capital or "on terms satisfactory to . . . Silverhawk."  The transactions were closed within ninety days of the signing of the Indicative Term Sheet, and as a result triggered Canatxx's obligation to pay the Opportunity Cost Fee under the binding provisions of the Indicative Term Sheet.  Silverhawk's motion is granted with respect to the question of whether Canatxx breached the Opportunity Cost Fee provision of the Term Sheet.

## III.  An Unenforceable Penalty or Unconscionable Provision

Canatxx argues that the £3 million Opportunity Cost Fee is unenforceable because it is a liquidated damages clause that imposes a penalty and because it is unconscionable. (Docket Entry No. 52 at 21–23).

### A.  Liquidated Damages

A liquidated damages clause is "[a] contractual provision that determines in advance the measure of damages if a party breaches the agreement."  BLACK'S LAW DICTIONARY 949

(8th ed. 2004).  "[A] party generally should be awarded neither less nor more than his actual damages," and "has no right to have a court enforce a stipulation which violates the principle underlying that rule."  *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991).  A liquidated damages clause is enforceable only if "the harm caused by the breach is incapable or difficult of estimation" and "the amount of liquidated damages called for is a reasonable forecast of just compensation."  *Id.* (quotations omitted).  "Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide."  *Id.*  "Sometimes, however, factual issues must be resolved before the legal question can be decided.  For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were."  *Id.*

The Indicative Term Sheet was not a binding contract for Silverhawk to purchase convertible senior notes.  The only binding provisions in the Indicative Term Sheet are the Opportunity Cost Fee section and the Reimbursement of Expenses section.  Canatxx's entry into a transaction not contemplated by the Term Sheet within ninety days after signing did not breach the parties' contract.  The £3 million Opportunity Cost Fee does not determine in advance the measure of damages for a contract breach.  Rather, the Opportunity Cost Fee imposes an independent legal obligation to pay £3 million on the occurrence of certain specified conditions.  The Opportunity Cost Fee is designed to ensure that Silverhawk was compensated for taking a defined risk, not to fix in advance compensation for the failure to perform a specific contractual obligation.  The Opportunity Cost Fee requires Canatxx to pay

Silverhawk for the work and foregone investments while it attempted to reach a deal with Canatxx, if Canatxx entered into certain transactions with other parties within a specified period. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 659, 664 (Tex. 2005) (holding that an oil and gas operating agreement that gave "consenting parties" the option to share operating costs and liabilities and production revenues, while "non-consenting parties" were subject to a "penalty" that temporarily relinquished their production-revenue share to the consenting parties and did not allow the nonconsenting parties to share in production revenues until after the consenting parties recouped their costs and received a profit, was not a liquidated damages clause because it did not "fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations").

The £3 million Opportunity Cost Fee provision is not an unenforceable penalty. The record shows that when the parties signed the Indicative Term Sheet, they assumed that Silverhawk would be conducting extensive work and investing resources, time, and money before any deal could be reached. Although the Reimbursement of Expenses section provided for the payment of reasonable fees, this was limited to fees Silverhawk paid to third parties working on the prospective deal and did not include compensation for the time Silverhawk's own principals and employees spent or the work they did. The parties also assumed that during the period Silverhawk worked on the deal, it would forego other opportunities because of the Canatxx investment. (Docket Entry No. 41, Ex. 62 at 2–4). At the same time, Canatxx was free to negotiate with others and obtain financing from other

33

sources; Canatxx had refused to agree to an exclusivity provision in the Indicative Term Sheet.  (*Id.*, Ex. 62 at 3–4).

The £3 million Opportunity Cost Fee was designed to compensate Silverhawk for the resources it invested in negotiating and performing due diligence, and for opportunities foregone during that period.  This amount could not be reliably estimated when the Indicative Term Sheet was entered.  The amount was calculated based on what Silverhawk would have received if the deal had closed, without any of the profit that Silverhawk might have realized from the equity ownership it would have held had a deal been reached.  Silverhawk would have received 2.5% of its £20 million investment as a transaction fee (£500,000) and 10% interest on the £20 million investment for a period of fifteen months until maturity (£2.5 million).  The £3 million Opportunity Cost Fee combines the transaction fee and the interest, but does not include the value of any equity ownership in Canatxx, which could have been significant.  The £3 million Opportunity Cost Fee meets the requirements for enforceability under Texas law because it approximated an amount of loss that could not be predicted in advance, in a way that reasonably forecasts the compensation for the loss.

Canatxx includes a declaration by J.F. "Chip" Morrow, "an executive/consultant with 40 years of experience in various financial, mortgage and business institutions," which Canatxx submits as an "expert declaration." (Docket Entry No. 52 at 22; *Id.*, Ex. 18).  In the declaration, Morrow makes a number of statements about the unfairness of the contract, such as that "the opportunity cost fee is one-sided as only Canatxx has to pay Silverhawk if any of the events occur, but Silverhawk has no consequences according to the *Indicative Term*

34

*Sheet*," and performs a basic mathematical calculation to illustrate that the amount of the Opportunity Cost Fee could dramatically dwarf the amount actually involved in a particular breach.  (Docket Entry No. 52, Ex. 18).  Silverhawk has moved to strike Morrow's declaration on the ground that is does not comply with Federal Rule of Evidence 702. (Docket Entry No. 57).

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).  The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible.  *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]."  *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592–93).  The district court's responsibility

is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Morrow's declaration is inadmissible.  He purports to provide conclusions as to legal issues rather than providing opinions on fact issues relevant to the determination of the legal issues. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (stating that it is improper for a witness to give legal conclusions).  Additionally, the record contains scant information about Morrow's experience with financial transactions of the sort involved in this case.  Although Morrow has forty years of experience in the finance sector, that does not qualify him to offer expert testimony on all financial transactions.  *See Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (finding that a polymer scientist was not qualified to give an expert opinion in a tire malfunction case because the scientist had no experience in applying polymer science to tires); *Wilson v. Woods*, 163 F.3d 935, 938 (5th Cir. 1999) (finding that a witness with a general mechanical engineering background was not qualified to offer expert testimony on a car accident).  Morrow's declaration consists of conclusory statements unsupported by discernible methodology.  Morrow provides no explanation of how he reached his conclusions or what standards or methods he used.

36

Morrow's declaration does not raise a fact issue as to whether the Opportunity Cost Fee is unenforceable as a penalty.

### B.    Unconscionability

"In general, the term 'unconscionability' describes a contract that is unfair because of its overall one-sidedness or the gross one-sidedness of its terms." *Kendziorski v. Saunders*, 191 S.W.3d 395, 406 (Tex. App.–Austin 2006, no pet.) (citing *Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 816 (Tex. App.–Dallas 1999, no pet.)). In assessing whether an agreement is unconscionable, a court must look at both the circumstances surrounding the adoption of the terms in controversy, such as unfair bargaining position, and the terms themselves.  The former is procedural unconscionability; the latter, substantive unconscionability. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J., concurring); *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 821 (Tex. App.–San Antonio 1996, no writ).  A court "must examine the entire atmosphere in which the agreement was made; the alternatives, if any, available to the parties at the time the contract was made; the 'nonbargaining ability' of one party; whether the contract was illegal or against public policy; and whether the contract was oppressive or unreasonable." *In re Turner Bros. Trucking Co.*, 8 S.W.3d 370, 376 (Tex. App.–Texarkana 1999, pet. denied).  "The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse – the circumstances surrounding the negotiations must be shocking." *Ski River Dev., Inc. v. McCall*a, 167 S.W.3d 121, 136 (Tex. App.–Waco 2005, pet. denied).  "[A] party who

knowingly enters a lawful but improvident contract is not entitled to protection by the courts." *Wade v. Austin*, 524 S.W.2d 79, 85–86 (Tex. Civ. App.–Texarkana 1975, no writ). Unconscionability is a question of law to be decided by the court. *See McCalla*, 167 S.W.3d at 136; *Turner*, 8 S.W.3d at 375.

There is no evidence of procedural unconscionability in the record. Canatxx is a sophisticated party, was represented by experienced and capable negotiators, was pursued by multiple financial suitors in addition to Silverhawk, and did not suffer from any apparent unfair bargaining disadvantage. The record shows that the Opportunity Cost Fee provision was negotiated and agreed upon in lieu of giving Silverhawk an exclusivity provision. "A party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts." *Wade*, 524 S.W.2d at 85–86.

Morrow's declaration does not raise a fact issue as to unconscionability. Even considering that affidavit, Silverhawk would still be entitled to summary judgment on the issue of unconscionability. Morrow opines that a £3 million fee is unfair because it is a "one-sided" obligation. As the cases recognize, opportunity cost fees or other break-up fees have well-recognized benefits for both prospective buyers and sellers. *See In re APP Plus, Inc.*, 223 B.R. at 874; *Integrated Res., Inc.*, 135 B.R. at 750.

Silverhawk's summary judgment motion is granted with respect to Canatxx's affirmative defenses.

IV.      **Conclusion**

Silverhawk's motion for summary judgment is granted, Canatxx's motion to strike is denied, and Silverhawk's motion to strike granted.  No later than **May 30, 2008**, the parties must submit a proposed final judgment or identify additional issues to be resolved.

SIGNED on May 8, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

39